THE INSTRUMENTALIST COMPANY, Plaintiff-Appellee, v. BAND, INC., *et al.*, Defendants-Appellants.

First District (5th Division) No. 85—0638

Opinion filed June 28, 1985.

Mordecai M. More and Ramon Martinez, Jr., both of Naphin, Banta & Cox, of Chicago, for appellants.

James S. Gordon and Edward Slovick, both of Chicago, for appellee.

JUSTICE SULLIVAN delivered the opinion of the court:

Defendants, Band, Inc. (Band), and Kenneth L. Neidig (Neidig) bring this interlocutory appeal from the issuance of a preliminary injunction restraining them until further order of the court from competing with plaintiff in violation of a restrictive covenant in an employment agreement between plaintiff and defendant, Neidig.

As alleged in its amended complaint for injunctive relief, plaintiff is the publisher of *The Instrumentalist*, a monthly magazine directed

toward school band and orchestra directors and music teachers. *The Instrumentalist* has been in publication continuously since 1946 and currently has more than 19,000 paid subscribers throughout the United States and in numerous foreign countries. Band, a Michigan corporation chartered in June 1984, is the publisher of *Band Magazine*, a bimonthly periodical distributed free of charge to essentially the same market as *The Instrumentalist*. Neidig was employed by plaintiff as editor and advertising manager of *The Instrumentalist* from June 1970 to June 1984, throughout which period the terms and conditions of his employment were governed by an employment contract which was renegotiated and renewed periodically. The agreement at issue in this case, executed in March 1981 but made retroactively effective as of July 1, 1979, contained *inter alia*, the following covenant:

> "5. Neidig agrees that for a period of two years following the termination of his employment with Company, he will not be employed by, consult for, accept compensation for, own, operator, manage or in any other way work for any of the following listed publications or business entities: a) Music Educators National Conference; b) *The School Musician Director and Teacher*; c) *Woodwind World Brass and Percussion*; d) *Music Journal*, or e) any other business entity or person engaged in the business of publishing, selling, or distributing a magazine or other periodical directed to or primarily used by band or orchestra directors, piano or organ teachers or junior or senior high school instrumental musicians in the United States of America. During such two year period, Company shall have first right of refusal on any articles Neidig may prepare for publication in a national music magazine. Specifically excluded from the restrictions of this paragraph 5, and thereby available employment to Neidig after the term of his employment with Company, is employment related to the publication of a 'house organ' or any magazine published by a company in the music industry, provided that magazine is distributed without any charge to each subscriber."

In June 1984, Neidig voluntarily terminated his employment with plaintiff, and became a principal shareholder in Band and editor of *Band Magazine*, the first issue of which was published in September of that year. Plaintiff thereafter filed a complaint for preliminary and permanent injunctive relief seeking to restrain Neidig from working for Band in violation of the terms of the restrictive covenant.

At the preliminary injunction hearing, James Rohner, plaintiff's

president and an attorney, testified that he had drafted each of the four employment contracts executed by plaintiff and Neidig over the course of the latter's employment with *The Instrumentalist.* As originally submitted to Neidig, the contract at issue contained either a three-year or 30-month noncompetition clause, which Neidig rejected, counterproposing a 12-month restriction and voluntary relinquishment of the entire exclusionary clause allowing him to work for "house organs" or magazines published by companies in the music industry—described by Rohner as journals published by companies wishing to promote their own music-related products—in exchange for a clause permitting him to start a new magazine after that one-year period. Eventually, after nearly 21 months of periodic negotiations, Neidig agreed to a two-year restriction in return for various modifications of other terms, including elimination of some post-employment proscriptions contained in the three previous contracts and increased compensation.

Rohner further testified that throughout the 14 years of his employment with plaintiff, Neidig was both editor and advertising manager of *The Instrumentalist.* As editor, he was responsible for soliciting and editing articles submitted by music experts and educators and generally preparing the magazine for publication. Between 1970 and 1979, he also had near-exclusive responsibility for soliciting advertisements for *The Instrumentalist,* as well as for *Clavier* and *Accent,* two other music magazines published by plaintiff. Although Will Garvey was hired as assistant advertising manager in 1979, Neidig continued to exercise full decisional authority as to the division of responsibility for soliciting and contacting existing and potential advertisers. Neidig compiled a list entitled "KLN [Kenneth L. Neidig] Close Contacts" of the top 30 to 40 advertisers—most of whom had been advertising in *The Instrumentalist* for 15 to 30 years and together accounted for approximately one-half of its advertising volume and revenue—with directions to Garvey and the other staff members that the companies thereon were his exclusive accounts with whom no one else was allowed contact without his permission. In addition, Neidig had complete discretion to contact any of the more than 100 smaller advertisers, including those assigned to Garvey. Several times a year, Neidig travelled, at plaintiff's expense and with its encouragement, to music conventions and to the offices of the firms which advertised in plaintiff's magazines and thereby developed personal and, in some cases, social relationships with the persons in those firms responsible for making advertising purchases.

As presiding of *The Instrumentalist,* Rohner's duties were pri-

marily administrative, and while he sometimes made suggestions to Neidig concerning the servicing of their advertising customers, he rarely had personal contact therewith.

Neidig submitted his resignation on February 28, 1984, to be effective upon the expiration of the contract—on June 30, 1984—at first stating, when asked, that he had no future plans and later refusing to disclose them. When he reminded Neidig of the post-employment agreement and expressed his hope that there would be no disputes thereabout, Neidig replied, "No, I can read." In late July, after learning of Neidig's plans to publish a new magazine and that he had been soliciting authors and advertisers with whom he had developed close relationships while working for plaintiff, to write for and advertise therein, plaintiff's counsel wrote to Band in Michigan, advising that company of the restrictive covenant and its intention to enforce the terms thereof. The first issue of *Band Magazine*, published in September 1984, was nearly identical to *The Instrumentalist* in appearance and content, its exclusion of editorial material relating to orchestras and the fact that it was distributed without cost being the only two substantive differences. Forty-two of the 45 advertisers in the first issue of *Band Magazine* and 45 of 45 in the second issue were firms which regularly purchased advertising space in *The Instrumentalist* and several of them ceased to do so, or significantly reduced the quantity of their advertising in the January and February 1985 issues thereof. In fact, a review of plaintiff's company records indicated that advertising inches and revenue declined approximately 35% in January and 15% in February 1985 from the same months a year earlier.

Neidig testified, as an adverse witness, that he was active in the music field for several years prior to his employment with plaintiff. Between 1962 and 1970, he wrote a book entitled *The Band Director's Guide*, worked as a band director at a school in Kentucky and served as managing editor of the *Bluegrass Music News*, a journal published by the Kentucky Music Education Association. During the course of these endeavors, he had occasion to meet and work with several of the same persons with whom he later had contacts in his capacity as editor and advertising manager of *The Instrumentalist*.

In 1970, Traugott Rohner, founder and then-president of The Instrumentalist Company, wrote a letter offering him the position with plaintiff and enclosed therewith an employment contract which had been drafted by his son, James, containing a four-year noncompetition clause. Although he signed that first contract without objection or change, because he believed he had no choice but to do so, over the next several years he became increasingly concerned about the post-

employment restrictions and, in subsequent contract-renewal negotiations, expressed that concern to James Rohner, who had succeeded his father as plaintiff's president. Rohner would not agree to their removal, however, acquiescing only to a time reduction thereof from four years to 30 months in the second and third contracts, executed in 1973 and 1976 respectively, and to two years in the contract at issue. Neidig acknowledged that during his tenure with plaintiff he had primary responsibility and authority for soliciting and servicing advertisers and that in the course thereof he developed close, personal relationships with some of the officers of those firms. Although at some point after Will Garvey was hired as assistant advertising manager, he (Neidig) compiled the "KLN Close Contacts List" of the top 30 or more advertisers—most of whom also advertised in other music journals and whose names, addresses and telephone numbers were readily obtainable by potential competitors—they were not his "exclusive" accounts, the advertising department responsibilities having been shared by him and Garvey under Rohner's supervision. He conceded, however, that Rohner's and Garvey's contacts with those advertisers were minimal and that Garvey seldom contacted any of them without his prior knowledge and approval.

Will Garvey, who succeeded Neidig as advertising manager of *The Instrumentalist*, testified that before he joined the staff, Neidig informed him that he had developed close personal relationships with many of the 40 or 50 major advertisers named in a list he compiled, almost all of whom were long-term advertisers in plaintiff's magazines; that he wished to retain responsibility for contacting and servicing them; and that any contacts made by him (Garvey) were to be made only with his prior permission. Following the publication of *Band Magazine* several major advertisers either ceased placing, or reduced the quantity of, their advertising in *The Instrumentalist*.

After arguments by counsel, the trial court granted plaintiff's motion for preliminary injunction restraining Neidig from continuing his employment with *Band Magazine* until further order, and this interlocutory appeal, brought pursuant to Supreme Court Rule 307(a)(1) (87 Ill. 2d R. 307(a)(1)), followed.

OPINION

Defendants generally contend, on various grounds, that the preliminary injunction was improperly entered and should, therefore, be dissolved.

■■ Initially, we note that a preliminary injunction is a provisional remedy granted to preserve the status quo, *i.e.*, the last, peace-

able uncontested status which preceded the litigation, pending a hearing of the case on its merits. (*Hydroaire, Inc. v. Sager* (1981), 98 Ill. App. 3d 758, 424 N.E.2d 719.) In order for an injunction to issue, the party seeking it must show that (1) he possesses a clear right or interest needing protection; (2) there is no adequate remedy at law; (3) irreparable harm will result if it is not granted; and (4) there is a reasonable likelihood of success on the merits. (*Morrison Metalweld Process Corp. v. Valent* (1981), 97 Ill. App. 3d 373, 422 N.E.2d 1034; *Image Supplies, Inc. v. Hilmert* (1979), 71 Ill. App. 3d 710, 390 N.E.2d 68.) In this last regard, all that is required of the petitioning party at the preliminary injunction stage of proceedings is that he raise a fair question as to the existence of the right claimed (*Hayden's Sport Center, Inc. v. Johnson* (1982), 109 Ill. App. 3d 1140, 441 N.E.2d 927; *Morrison Metalweld Process Corp. v. Valent* (1981), 97 Ill. App. 3d 373, 422 N.E.2d 1034), and demonstrate that he probably will be entitled to the relief prayed for if the proof should sustain the allegations (*The Packaging House, Inc. v. Hoffman* (1983), 114 Ill. App. 3d 284, 448 N.E.2d 947). In addition to consideration of the above criteria, the trial court must conclude that the benefits of granting the injunction outweigh the possible injury which defendant might suffer as a result thereof. (*The Packaging House, Inc. v. Hoffman* (1983), 114 Ill. App. 3d 284, 448 N.E.2d 947; *Booth v. Greber* (1977), 48 Ill. App. 3d 213, 363 N.E.2d 6.) Finally, since the decision to grant or deny preliminary injunctive relief rests within the sound discretion of the trial court, and because its findings may not be disturbed absent a showing of an abuse thereof (*Shorr Paper Products, Inc. v. Frary* (1979), 74 Ill. App. 3d 498, 392 N.E.2d 1148; *Wessel Co. v. Busa* (1975), 28 Ill. App. 3d 686, 329 N.E.2d 414), the role of a reviewing court is limited to a determination of whether those findings are contrary to the manifest weight of the evidence (*Hydroaire, Inc. v. Sager* (1981), 98 Ill. App. 3d 758, 44 N.E.2d 719; *Booth v. Greber* (1977), 48 Ill. App. 3d 213, 363 N.E.2d 6).

■ The propriety of injunctive relief in the present case depends upon the enforceability of the restrictive covenant at issue. The question of whether a covenant not to compete is enforceable is one of law (*Tower Oil & Technology Co. v. Buckley* (1981), 99 Ill. App. 3d 637, 425 N.E.2d 1060), and because such covenants operate at least as partial restraints of trade, they are scrutinized carefully by the courts to ensure that their intended effect is not the prevention of competition *per se* (*Hydroaire, Inc. v. Sager* (1981), 98 Ill. App. 3d 758, 424 N.E.2d 719). However, where a party to a contract agrees, in exchange for certain benefits, to refrain from competing with his em-

ployer following termination of the employment relationship (*Morrison Metalweld Process Corp. v. Valent* (1981), 97 Ill. App. 3d 373, 422 N.E.2d 1034), and the time and territorial limitations of the agreement (*Tower Oil & Technology Co. v. Buckley* (1981), 99 Ill. App. 3d 637, 425 N.E.2d 1060), as well as its effect upon the parties and the public (*Morrison Metalweld Process Corp. v. Valent* (1981), 97 Ill. App. 3d 373, 422 N.E.2d 1034), are not unreasonable, enforcement by injunction is customary and proper (*Canfield v. Spear* (1969), 44 Ill. 2d 49, 254 N.E.2d 433). In this regard the basic test applied by Illinois courts is whether the covenant is reasonably necessary to protect the employer from improper or unfair competition (*Morrison Metalweld Process Corp. v. Valent* (1981), 97 Ill. App. 3d 373, 422 N.E.2d 1034), a determination which necessarily depends upon the facts and circumstances of each case (*J.D. Marshall International, Inc. v. Fradkin* (1980), 87 Ill. App. 3d 118, 409 N.E.2d 4; *Wessel Co. v. Busa* (1975), 28 Ill. App. 3d 686, 329 N.E.2d 414).

■ Defendants first assert that plaintiff is not entitled to injunctive relief because it failed to establish the existence of a protectable business interest in its advertisers, arguing that absent evidence of the misappropriation of trade secrets or other confidential information, a protectable interest will be found only where there is a long-term, *exclusive* relationship between plaintiff and the customers in which the interest is claimed. We disagree.

While it is true that ordinarily an employer has no proprietary interest in its customers (*The Packaging House, Inc. v. Hoffman* (1983), 114 Ill. App. 3d 284, 448 N.E.2d 947), this court has repeatedly held that there are two general situations in which such an interest may be found to exist for purposes of enforcing a covenant not to compete: (1) where the former employee acquired confidential information through his employment and subsequently attempted to use it for his own benefit, and (2) where, by nature of the business, the customer relationship is near-permanent and, but for his association with plaintiff, defendant would not have had contact with the customers in question (*The Packaging House, Inc. v. Hoffman* (1983), 114 Ill. App. 3d 284, 448 N.E.2d 947; *Hayden's Sport Center, Inc. v. Johnson* (1982), 109 Ill. App. 3d 1140, 441 N.E.2d 927; *Morrison Metalweld Process Corp. v. Valent* (1981), 97 Ill. App. 3d 373, 422 N.E.2d 1034; *Hydroaire, Inc. v. Sager* (1981), 98 Ill. App. 3d 758, 424 N.E.2d 719; *Nationwide Advertising Service, Inc. v. Kolar* (1975), 28 Ill. App. 3d 671, 329 N.E.2d 300).

Preliminarily, we note that plaintiff does not allege, nor does the evidence suggest, that Neidig misappropriated any confidential infor-

mation acquired while in its employ. Indeed, plaintiff concedes that the names, addresses and telephone numbers of its advertisers were readily obtainable by anyone wishing to contact them. Thus, our inquiry is whether the situation here is of the second type in which a protectable business interest is recognized.

In this regard, we first note that defendants have cited no cases, nor have we found any, which hold that in order for there to be a legally protectable interest in customers they must be both long-term and exclusive to plaintiff. Moreover, we do not agree that a requirement of exclusivity can be inferred, as defendants posit, from the cases on which they rely. In both *Cockerill v. Wilson* (1972), 51 Ill. 2d 179, 281 N.E.2d 648, and *Canfield v. Spear* (1969), 44 Ill. 2d 49, 254 N.E.2d 433, the court's determinations that the noncompetition contracts executed by formerly associated doctors were valid and enforceable were based on findings as to the reasonableness of the time and territorial restrictions imposed by the agreements into which the promisors had knowingly and voluntarily entered. Therefore, while it may be true, as defendants argue, that "the facts in these cases show that the courts *will* protect exclusive, long-term relationships between professional practitioners and their patients or clients absent a showing of trade secrets or confidential information" (emphasis added)—assuming *arguendo* that the client relationships in those cases were exclusive, as defendants state it can be "fairly concluded"—neither decision holds nor, we think, even suggests that the relationship *must* be exclusive, or professional, in order to qualify for such protection. Neither do we believe that such a conclusion can be extracted from the holding in *Booth v. Greber* (1977), 48 Ill. App. 3d 213, 363 N.E.2d 6, wherein this court affirmed the granting of a preliminary injunction restraining defendant from operating an electrolysis business in violation of the terms of a restrictive covenant prohibiting her from competing with plaintiff within a 25-mile radius of plaintiff's business for a period of two years. Once again, while the facts as presented might suggest that plaintiff's clients were exclusive customers, the court did not state that exclusivity was a prerequisite to enforcement of the contract. Rather, the court based its decision on the fact that the clients in question were long-term customers with whom defendant would not have had contact were it not for her association with plaintiff. Thus, we find nothing in *Cockerill, Canfield* or *Booth* to be inconsistent with the previously cited authority holding that a protectable interest will be found where, by the nature of the business, the customers in question are *near-permanent* and that but for defendant's association with plaintiff, he would not have had contact with them.

See, *e.g., Morrison Metalweld Process Corp. v. Valent* (1981), 97 Ill. App. 3d 373, 422 N.E.2d 1034.

It was this standard which the trial court applied in determining that, for purposes of preliminary injunctive relief, plaintiff had sufficiently demonstrated the existence of a protectable business interest in its advertisers. Specifically, the court found that they were "long-standing, near permanent" customers with whom defendant had, over the many years of his employment with plaintiff, developed a "closeness and goodwill" he would otherwise have been unable to engender. In our view, the evidence presented at the hearing supports those findings. The testimony and exhibits contained in the record showing that the majority of plaintiff's 40 to 50 top advertisers, in terms of the amount and frequency of their advertising space purchases, had been advertising continuously in *The Instrumentalist* for at least 15 years—several since its inception in 1946—clearly satisfy the requirement that the customers be near-permanent. Furthermore, it is essentially uncontroverted that during his 14-year tenure as editor and advertising manager of *The Instrumentalist* Neidig exercised near-exclusive authority for contacting and servicing these advertisers, the names of whom were compiled in the "KLN Close Contacts List" and given to the assistant advertising manager with instructions that any contacts therewith be made only upon his prior approval; that as a result thereof, he developed, in many cases, close, personal relationships as well as strong business ties with the individuals responsible for making advertising decisions for their firms, all of whom, he conceded, he met while working for plaintiff; and that virtually all of the advertisers who placed advertisements in *Band Magazine* were among that group of long-term, near-permanent customers of plaintiff. These facts strongly indicate that it was only through his employment with *The Instrumentalist* that Neidig was thereafter able to successfully solicit their business for his own magazine. Thus, we believe the evidence was sufficient to show that plaintiff had a business interest in need of protection.

Defendant Neidig also asserts, however, that the time and territorial restraints of the covenant are unreasonable because, he maintains, they prohibit him, for a period of two years, from working for any company in the world which competes with plaintiff in the United States. He argues that these terms were not designed to protect any legitimate business interest of plaintiff, but rather to prevent competition *per se* and are, therefore, contrary to public policy and unenforceable.

As noted earlier, enforceability of a restrictive covenant in an

employment contract is dependent on whether, given the particular facts of the case, the restraints imposed thereby are reasonably necessary for the protection of plaintiff's business from unfair or improper competition. (*Booth v. Greber* (1977), 48 Ill. App. 3d 213, 363 N.E.2d 6.) The reasonableness of the restrictions is measured by their effect, if any, on the general public, the extent of the hardship imposed thereby on the restricted party and whether they are necessary to protect a legitimate business interest of the former employer. *House of Vision, Inc. v. Hiyane* (1967), 37 Ill. 2d 32, 225 N.E.2d 21; *Morrison Metalweld Process Corp. v. Valent* (1981), 97 Ill. App. 3d 373, 422 N.E.2d 1034.

In the instant case, the trial court found that "because of the nature of the business" the territorial extent of the covenant—encompassing the entire country—was reasonable. We agree.

■ With respect to the geographic scope of noncompetition covenants, courts generally look to whether the restricted area is coextensive with that in which the employer is doing business (*Donald McElroy, Inc. v. Delaney* (1979), 72 Ill. App. 3d 285, 389 N.E.2d 1300), and have upheld as reasonable even those covenants containing no geographic limitation where the employer was doing business nationwide and the purpose of the restriction was to protect him from losing customers to a former employee who, by virtue of his employment, gained special knowledge and familiarity with the customers' requirements (*Morrison Metalweld Process Corp. v. Valent* (1981), 97 Ill. App. 3d 373, 422 N.E.2d 1034; *Wolf & Co. v. Waldron* (1977), 51 Ill. App. 3d 239, 366 N.E.2d 603; *Donald McElroy, Inc. v. Delaney* (1979), 72 Ill. App. 3d 285, 389 N.E.2d 1300).

Here, the evidence establishes that although *The Instrumentalist* is published in Illinois, its subscribers and advertisers are located throughout the United States, and indeed, in several foreign countries. Thus, delineating a less-than-nationwide limitation would have provided plaintiff with little or no protection from the loss of customers to Neidig by reason of his long-term relationship with them and the knowledge he gained as editor and advertising manager of is magazine.

Moreover, we do not construe its language as precluding Neidig from working for any company in the world which competes with plaintiff in the United States or, as he also asserts, preventing him from pursuing his profession as an editor of music education journals. Rather, it extends only to employment by those publications which are directed to the specifically defined group of subscribers to which plaintiff's magazines are directed; and even that limitation is qualified

by the exclusion of "house organs or any magazine published by a company in the music industry, provided that magazine is distributed without charge to each subscriber." Neidig is therefore free to accept employment with a music magazine, whether as editor or advertising manager, or both, or even to publish his own magazine so long as any such publication is outside the specific prohibitions of the covenant.

Similarly, as to the time limitation, we believe that in the light of the circumstances here, including the broad nature and extent of Neidig's responsibilities and authority throughout his 14-year association with plaintiff, as well as the near-exclusive contacts and close relationships he maintained with the advertisers, that the two-year limitation—which represents a reduction from the time restriction in previous contracts and a compromise between plaintiff's proposal of three years and his counterproposal of one—is reasonably related to the protection of plaintiff's interests, and neither adversely affects the general public nor imposes an undue hardship on Neidig.

Defendants alternatively contend that even if the restrictive covenant is found to be valid and enforceable, his association with *Band Magazine* is exempt therefrom by virtue of the exclusionary clause mentioned above, which allows him "employment related to the publication of a 'house organ' or any magazine published by a company in the music industry, provided that magazine is distributed free of charge to each subscriber," and thus does not constitute a breach of the employment agreement.

As to this defense, the trial court specifically found that *Band Magazine* did not come within the above-quoted exemption, and we agree, noting again that in addition to the four named publications from which Neidig was proscribed from working, the covenant also prohibited, in clause (e), "employment with any other business entity or person engaged in the business of publishing, selling or distributing a magazine or other periodical directed to or primarily used by band or orchestra directors *** or junior or senior high school instrumental musicians ***." Based on the uncontroverted evidence presented at the hearing, it is clear that Band, Inc., was formed to be and operates as a business entity in the business of publishing a magazine directed primarily to the market described. The fact that *Band Magazine* is distributed free of charge does not, in our view, remove it therefrom or, conversely, bring it within the exclusion for house organs or magazines published by companies in the music industry as the evidence indicates those terms were understood by the parties. To find otherwise would require us to ignore the use of the disjunctive "or" in clause (e) prohibiting the publishing, selling, *or* distributing of the type of maga-

zine thereafter described. Had the parties intended that the only proscription be that Neidig not work for a paid-subscription journal, they need only have added after clause (e) a provision exempting free publications, rather than inserting the more extensive and specific exclusionary clause, or at the very least, omitted the words "or distributing" from the covenant. As it is, the covenant clearly prohibits the type of employment in which Neidig was engaged with Band.

 Similarly we find no support for Neidig's second alternate contention, that he signed the contract at issue under duress, that it was the product of overreaching by plaintiff and that it is therefore an unconscionable and invalid contract of adhesion. As stated in *Star Finance Corp. v. McGee* (1975), 27 Ill. App. 3d 421, 426, 326 N.E.2d 518, 522, cited by defendants, a contract of adhesion is generally described as one "prepared entirely by one party, and which, due to the disparity in bargaining power between the draftsman and the second party, must be accepted or rejected by the second party on a 'take it or leave it' basis without opportunity for bargaining and under such conditions that the second party or 'adherer' cannot obtain the desired product or service save by acquiescing in the form of the agreement."

In the case at bar, it appears that Neidig is a college-education man who functioned most successfully in a position of substantial responsibility and authority throughout his 14 years in plaintiff's employ; that during that period he entered into four separate contracts, all of which contained restrictive covenants but each of which after the first was different from and, we believe, more favorable—in terms of reductions in the restraints contained therein and increases in compensation—than the one before; and that the contract at issue was executed only after a prolonged (21-month) period of negotiations between him and plaintiff during which he agreed to certain proposed terms, rejected others, offered counterproposals and made clear his desire to eventually leave plaintiff's employ to publish a magazine of his own.

To paraphrase the court in *Canfield v. Spear* (1969), 44 Ill. 2d 49, 254 N.E.2d 433, when the agreement was signed, the defendant was hardly incompetent to look out for his own interests. We believe the trial court was justified in concluding that he was fully aware of what he was doing.

 In summary, it is our opinion that the trial court's findings—that for purposes of preliminary injunctive relief, the evidence was sufficient to demonstrate that plaintiff possesses a legitimate business interest in need of protection; that the restraints imposed by the cove-

nant are reasonably related thereto; that there is no adequate remedy at law; that injury to plaintiff will result if the covenant is not enforced; that there is a likelihood of plaintiff's success on the merits; and that the benefits in granting the injunctive relief sought by plaintiff outweigh the injury which defendant might suffer thereby—are clearly supported by the evidence presented. Consequently, we find no abuse of discretion by the court in entering the preliminary injunction.

For the reasons stated, the order of the trial court granting preliminary injunctive relief to plaintiff is affirmed.

Affirmed.

MEJDA, P.J., and PINCHAM, J., concur.