CHARLES P. YOUNG COMPANY *et al.*, Plaintiffs-Appellants, v. ROBERT H. LEUSER *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 85—1875

Opinion filed November 5, 1985.

Skadden, Arps, Slate, Meagher & Flom, of Chicago (John R. Schmidt, Wayne W. Whalen, and Timothy A. Nelsen, of counsel), for appellants.

Gardner, Carton & Douglas, of Chicago (Michael E. Barry, of counsel), for appellees Robert H. Leuser and Alfred H. Shotwell III.

D'Ancona & Pflaum, of Chicago, and Further, Fahrner, Bluemle & Mason, of San Francisco, California (Barry T. McNamara, Arthur Don, Jean Maclean Snyder, Steven E. Gilman, Daniel S. Mason, Michele C. Jackson, Vincent A. Ruiz, and Frederick J. Geonetta, of counsel), for appellee Pandick Midwest, Inc.

JUSTICE BILANDIC delivered the opinion of the court:

This is an expedited interlocutory appeal from the circuit court's denial of plaintiffs-appellants' motion for a preliminary injunction. Plaintiffs-appellants, Charles P. Young Company (CPY) and its wholly owned subsidiary Charles P. Young Chicago, Inc. (CPYC), sought to enjoin appellees Robert H. Leuser and Alfred H. Shotwell III from working for appellee Pandick Midwest, Inc. (Pandick), one of appellants' competitors. Appellants also sought to enjoin Pandick from employing appellees Leuser and Shotwell and 14 other former CPYC employees who are not parties to this action. The circuit court granted appellants' motion for a temporary restraining order (TRO) but after a hearing it dissolved the TRO and refused to issue a preliminary injunction. This appeal followed. The sole issue is whether the trial court abused its discretion in refusing to issue the preliminary injunction.

Appellant CPYC is a financial printer in the Chicago area, and it is a wholly owned subsidiary of CPY (formerly Ticor Print Network,

Inc.), a national company with regional offices throughout the United States. Appellants are owned by Norlin Corporation (Norlin), which is headed by its chairman of the board, chief executive officer (CEO), and president, Patrick J. Rooney. Appellee Pandick is also a financial printer in the Chicago area, and it is a wholly owned subsidiary of Pandick, Inc., a national company with regional offices. Appellees Leuser and Shotwell were officers of CPYC who resigned their positions, followed two days later by 14 "at-will" employees. These resignations are the subject of this litigation.

First, some background is required. Before Rooney assumed control of Norlin, he was, and continues to be, an investment banker and a principal in the firm of Rooney, Pace Inc. On or about March 2, 1983, Rooney and a group of investors (the Rooney Group) embarked on a course of action that was designed to accomplish the takeover of Norlin, whose stock is publicly traded. By January 12, 1984, the Rooney Group had acquired some 32% of Norlin's stock. In order to fend off an apparent hostile takeover, Norlin filed suit on January 13, 1984, alleging violations of Federal securities laws and seeking to enjoin the Rooney Group from buying any more stock. Norlin's motion for a TRO was denied because it failed to show irreparable harm.

On January 20, 1984, the same day that its motion was denied, Norlin began a series of defensive maneuvers. It countered by diluting the Rooney Group's holdings with the issuance of more Norlin stock that would find itself into friendly hands. This tactic, of comparatively recent origin, is known as "shark repellant." Norlin's goal was to have the Rooney Group exhaust its resources before Norlin ran out of creative ways to issue more stock, which would result in the Rooney Group's abandoning its hostile takeover plans.

On January 20, 1984, Norlin transferred over 28,000 shares of treasury common stock to Andean Enterprises, Inc., a Panamanian-based wholly-owned subsidiary of Norlin. Five days later, Norlin conveyed 800,000 shares of authorized, but unissued, voting stock to Andean. Norlin also issued and transferred 185,000 shares of common stock to the newly created Norlin Industries, Inc., Employees Stock Option Plan and Trust (ESOP), to which Norlin appointed three board members as trustees. On February 9, 1984, the Rooney Group filed a counterclaim against Norlin, alleging that Norlin's transfers violated various securities laws. It also sought injunctive relief and, on April 16, 1984, the Federal district court enjoined Norlin from voting the shares transferred to Andean and to the ESOP. The Second Circuit affirmed. *Norlin Corp. v. Rooney, Pace Inc.* (2d Cir. 1984), 744 F.2d 255.

When the court rendered its decision, the Rooney Group owned 49.1% of the Norlin stock entitled to vote. Stripped of its ability to vote the shares intended as "shark repellant," the Norlin board "surrendered" control of the corporation to the Rooney Group. The transfer of power was accomplished by a settlement agreement that restructured the board and satisfied the requirements of control for the Rooney Group. The agreement was ratified by the Norlin shareholders at the annual meeting on September 6, 1984. Rooney promptly installed himself as chairman of the board, CEO and president. As part of this agreement, appellee Robert H. Leuser was forced to resign from the board, but he remained as CEO and president of CPYC, a wholly owned subsidiary on the lowest rung of Norlin's corporate ladder. Several months later, Rooney removed Calvin Aurand, who was CPY's chairman and president. Rooney assumed Aurand's position and thereby also became Leuser's immediate superior. Just as with his directorship, Leuser's official title with CPYC, as well as Shotwell's title as CPYC's executive vice-president, was, as a fact of corporate life, virtually terminable at the will of Rooney.

Appellees Leuser and Shotwell had signed employment contracts in December 1983, before Rooney's takeover of Norlin. The contracts were signed between appellees and CPY's predecessor, Ticor Print Network, Inc. Leuser signed a five-year contract and Shotwell a three-year contract. Paragraph 2(c) contained a covenant not to compete. Paragraph 5(a) provided in part that appellees could terminate their employment "as a result of a change of ownership of a majority of the Corporations' assets or voting securities not approved by the Corporation's Board of Directors ***." Paragraph 5(a) was intended to protect appellees Leuser and Shotwell in the event of a hostile takeover, and they rely on that clause to assert that they are no longer bound contractually to CPYC. Thus, the exact employment status of Leuser and Shotwell, from the date of the takeover, September 6, 1984, to the date of their resignation, June 10, 1985, has yet to be determined.

After Rooney assumed control of Norlin and CPY, he began to implement changes that concerned appellees Leuser and Shotwell and that were unpopular with the at-will employees. The changes included a reduction in sales commissions, a reduction and freeze on salaries, and a freeze on spending for capital equipment. Rooney also planned a separate public offering that would eventually lead to Norlin's divestiture of CPYC. He also announced that he would only stay on as head of CPY for two or three years. None of these moves inspired security or confidence among CPYC employees.

Having accomplished this takeover of Norlin, Rooney moved to establish Norlin's presence in the financial printing market through its subsidiaries. Appellee Pandick is a principal competitor. The record shows that Norlin, through appellant CPY, raided employees of Pandick in Boston, Houston, San Francisco, and other cities throughout the United States for its own offices. Pandick, in apparent retaliation, hired away 14 of approximately 22 Norlin (CPYC) employees for its Chicago office. The 14 were "at-will" employees. "At-will" employees are those who work without employment contracts.

It is obvious that there was a revolving door through which employees of Norlin and Pandick passed prior to this litigation. As the trial court indicated, the evidence shows that raiding employees is a common practice within the industry, yet appellants seek to enjoin Pandick from employing the former CPYC employees.

Employees Leuser and Shotwell resigned on June 10, 1985, and they signed contracts with Pandick the next day. On June 12, 1985, Rooney replaced Leuser with Nick Kane, from CPY's Houston office. Kane's vacancy was then filled with Bill Jupp, whom CPY recruited from Pandick. Appellee Shotwell was also quickly replaced with Stan Byrum. The at-will employees resigned on June 12, and they signed employment contracts with Pandick on June 13, 1985.

On June 14, 1985, appellants filed their complaint. They seek to enjoin Pandick from employing Leuser, Shotwell, and the at-will employees. They also seek to keep Leuser and Shotwell from working for Pandick or any other competitor for the remainder of their contract terms. The at-will employees are not parties to this action, but they have emerged suddenly as unwilling pawns who are caught in the corporate cross-fire between Pandick and Norlin. Appellants also filed an emergency motion for a TRO and a preliminary injunction. The trial court issued a TRO the same day.

Appellees filed their answers and generally denied the allegations of the complaint; they also interposed affirmative defenses. A hearing on the motion for a preliminary injunction was held over four days, and in that time 14 witnesses were called by appellants. At the close of their case, the court dissolved the TRO and denied appellants' motion for a preliminary injunction. In ruling, the court noted:

"It seems to me that we are dealing in the murky seas of those corporations with a bunch of barracuda-infested waters, because they all said [that] it's common practice to raid one another providing [that] there is no contract.

The questions as to Leuser and Shotwell, that is a question of breach of contract. The Plaintiff has woefully failed after 4

days of evidence to meet the necessary requirements for the issuance of a preliminary injunction.

   *** They [appellants] do have an adequate remedy at law and nowhere do they show any irreparable damage ***."

The court issued its ruling on July 1, 1985, and appellants filed this timely appeal pursuant to Supreme Court Rule 307(a) (87 Ill. 2d R. 307(a)).

██ ██ The law concerning the issuance of a preliminary injunction is well settled. One who seeks a preliminary injunction must prove each of the following essential elements: (1) he possesses a clear right or interest that needs protection; (2) there is no adequate remedy at law; (3) irreparable harm will result if it is not granted; and (4) there is a likelihood of success on the merits. (*The Instrumentalist Co. v. Band, Inc.* (1985), 134 Ill. App. 3d 884, 891, 480 N.E.2d 1273.) In addition, the trial court must conclude that the benefits of granting the injunction outweigh the possible injury that the opposing party might suffer as a result thereof. (134 Ill. App. 3d 884, 891.) Because the decision of whether to grant an injunction is within the discretion of the trial court, and its decision cannot be disturbed absent a showing of an abuse of that discretion, the role of a reviewing court is limited to a determination of whether the trial court's findings are contrary to the manifest weight of the evidence. 134 Ill. App. 3d 885, 891.

Appellants contend that the trial court found that there could be an inference of loss and therefore they met their burden of proving irreparable damage. The record, however, does not support appellants' argument. The court clearly found that "nowhere do they [appellants] show irreparable damage ***. [T]hey have not had one person tell me where the loss is. *** Having woefully failed to meet their burden, the preliminary injunction is denied and the TRO is dissolved."

██ The record supports the trial court's finding that appellants did not prove irreparable harm. Many witnesses testified that contracts in the printing business are awarded on the basis of competitive bidding. At least one witness testified that 80% of the jobs are on bid. In addition, most contracts extend over a number of years. Therefore, factors such as price and dependability of service are more significant in making sales than the efforts of any group of salespersons.

Further evidence of lack of any irreparable damage was the speed with which Leuser, Shotwell and the at-will employees were replaced. In addition, appellants also informed their shareholders, customers, and the general public that the departure of their personnel would not

affect their operation. In a document called "Plain Talk from Nick Kane," CPYC's new president confirmed that CPYC would continue to do business for the following reasons: "First, we've moved very quickly to replace the management who left by drawing on the talent and depth in our other offices. *** Second, we have in place the production teams responsible for the product that our customers value so highly; and third, we have built a base of loyal customers, many of whom intend to remain with Chas. P. Young."

Patrick Rooney also stated that the loss of the employees did not seriously impair his operation. He stated, "We are sorry to see these people leave, but the fact is, they were part of a much larger team that remains intact. We are production driven, and with talented, effective managers now on board, the teams have their leaders back and we're back to business as usual. *** We have brought in a number of senior managers from offices throughout our system who are located permanently in Chicago. They, along with a number of experienced people remaining at Chas. P. Young, comprise one of the most experienced groups of people in the business." Rooney stated, in sum, that appellants suffered no irreparable harm from the resignations.

The record also reveals that some of CPY's business came from customers who compete with Rooney, Pace Inc. Because Patrick Rooney owned large interests in both Rooney, Pace Inc. and CPY, some customers balked at doing business with CPY because they would be indirectly aiding a competitor and making him more formidable. Furthermore, some of the work in the financial printing business is sensitive, and some customers did not want the possibility of having their confidence compromised.

Appellants also contend that Leuser and Shotwell breached their fiduciary duty while they were allegedly under contract. The record shows that, since Rooney's takeover but before the mass resignations, Leuser, Shotwell, and the at-will employees met off the company's premises on two different occasions. These meetings were not held during working hours. On one occasion, Leuser's personal attorney was present. Appellants argue that the meetings were part of a conspiracy, on the part of appellees, to injure Norlin. Leuser, Shotwell, and the at-will employees, on the other hand, argue that the meetings were proper expressions of their freedom of association and that they only met to discuss their working conditions and their economic futures. Due to the conflicting testimony, the exact content of those meetings is not known at this time.

The employment status of Leuser and Shotwell at the time of those meetings has not been determined. Whether they were "at-will"

or "under contract" will ultimately be determined by the trial court. Such a determination could not be completed at this preliminary juncture of the litigation. The record does show that although Leuser and Shotwell may have been fiduciaries, they were at the lowest level of Norlin's corporate empire. Realistically, they could not be identified as key men. They were replaced within two days of their resignations without the benefit of a search committee. Norlin's public relations releases and Rooney's testimony establish that Leuser's and Shotwell's resignations did not result in any irreparable harm.

When the full trial of this case is completed, it is possible that appellants will prove that the conduct of Leuser and Shotwell constituted a breach of duty. In that event, they will have an adequate remedy at law and can be compensated by an award of damages.

The evidence is also conflicting about whether Pandick induced Leuser and Shotwell to breach their employment contracts. The nature and extent of the meetings between the parties has not yet been resolved. The evidence shows that Leuser and Shotwell met with Pandick's president for lunch in Chicago. A week later, Leuser alone met with Pandick officials. During both of those meetings, Leuser presented his attorney's opinion that both Leuser and Shotwell were no longer bound contractually to CPY. The evidence at trial may present a different picture and, if it does, appellants have an adequate remedy at law.

Appellants also claim that Pandick tortiously interfered with their at-will employees. However, the record does not support their position. The employees called to testify said that they freely exercised their right to change employment without any influence from Pandick. Rooney's statements that he was cutting commissions, reducing the work force, and considering the divestiture of the Chicago office caused the employees to feel insecure and to seek employment elsewhere. The employees also testified that they did not like Rooney's reputation in the financial community. He, or his companies, were penalized for violations of securities laws, including the antifraud provisions. Rooney did not refute this evidence. Pandick was the natural place to go because it was expanding its Chicago office.

■■ In sum, we find that the employees had sufficient cause to seek other employment. As we stated above, a trial court, in deciding whether to issue a preliminary injunction, must balance the benefits of issuing the injunction with the possible injury that a defendant may suffer. (*The Instrumentalist Co. v. Band, Inc.* (1985), 134 Ill. App. 3d 884, 891, 480 N.E.2d 1273.) Here, it would be extremely inequitable to have the at-will employees, who are not parties to this action, join

the unemployment line through no fault of their own. The issuance of a preliminary injunction would have enjoined Pandick from hiring these men and women, who are innocently caught in the middle of intense competition between two national companies. Also significant is the fact that they are at-will employees who were under no obligation to remain with their old employer. *Cf. Ancraft Products Co. v. Universal Oil Products Co.* (1980), 84 Ill. App. 3d 836, 405 N.E.2d 1162.

A related issue concerns paragraph 2(c), the restrictive covenant included in the contracts of employment between Leuser and Shotwell and appellant CPY's predecessor. Appellants argue that the noncompetition covenants are enforceable because the restrictions are "in-term," *i.e.*, applicable during the employment period, rather than "post-term," applicable after the employment period. Alternatively, they argue that the restrictions are enforceable because they are reasonable in scope and protect a justifiable business interest.

■ Appellants, however, have not shown a protectable interest. The record shows that the same customers are solicited by many printers in the industry. We have held repeatedly that customer information is not protectable when a customer has done business "with more than one company or otherwise changed businesses frequently so that they were known to an employer's competition." *Lincoln Towers Insurance Agency v. Farrell* (1981), 99 Ill. App. 3d 353, 358, 425 N.E.2d 1034.

■ Even if there were a protectable interest, the geographic scope of the covenant is too broad. In the recent case of *Dryvit System, Inc. v. Rushing* (1985), 132 Ill. App. 3d 9, 477 N.E.2d 35, a covenant provided that the defendant was prohibited from working for any competitor within any area in the United States in which the plaintiff was doing business. We held that the restriction was "patently beyond the needs of the employer to protect his interest and unduly harsh on the employee." (132 Ill. App. 3d 9, 13.) Here, the evidence shows that appellants are national companies with regional offices all over the United States. The parent corporation, Norlin, is incorporated under the laws of Panama, so the restrictions would conceivably extend beyond the continental United States. Thus, the fact that the restriction is only in-term is not dispositive. The cases cited by appellants are not applicable because they concern covenants incident to the sale of a business, which is not the case here.

■ In conclusion, the evidence is clearly sufficient to support the trial court's ruling that appellants have not proved irreparable harm. At trial, the appellants may prevail and receive an adequate remedy by way of damages. A preliminary injunction is an extraordinary rem-

edy and is generally employed only in matters of great injury, and then only with the utmost care and caution. *Roche Brothers v. Garrigan* (1980), 88 Ill. App. 3d 107, 111, 410 N.E.2d 338.

This appears to be the opening round of what may well be protracted litigation. We are not called upon to express an opinion that may bear on the ultimate disposition of this case. We merely conclude that the trial court did not abuse its discretion in refusing to issue a preliminary injunction.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

STAMOS, P.J., and HARTMAN, J., concur.