MIDWEST TELEVISION, INC., Plaintiff-Appellee, v. GARY L. OLOFFSON, Defendant-Appellant.

Third District   No. 3—98—0016

Opinion filed August 19, 1998.

W. Thomas Johnston (argued) and Mary W. McDade, both of Quinn, Johnston, Henderson & Pretorius, Chartered, of Peoria, for appellant.

Michael R. Lied (argued), SueAnn S. Billimack, and Sherrie J. Dornon, all of Husch & Eppenberger, LLC, of Peoria, for appellee.

Donald M. Craven, of Craven & Thornton, P.C., of Springfield, for *amicus curiae*.

JUSTICE LYTTON delivered the opinion of the court:

Defendant Gary Oloffson left his position as an on-air radio personality with plaintiff Midwest Television, Inc. (Midwest), in Peoria, Illinois, after his employment contract expired. When Oloffson began to work for a new local radio station, Midwest filed a motion seeking enforcement of a restrictive covenant in his contract. The trial court issued a preliminary injunction barring Oloffson from working for the new station for one year. Oloffson appeals. We affirm.

## FACTS

In 1987, Oloffson was hired as a morning disk jockey at an FM

radio station in Peoria, Illinois, that was owned by Midwest. He performed under the name Gary Olson, which he had begun to use in Rockford, Illinois, two years before taking the job with Midwest. Oloffson worked for Midwest for seven months without a contract before he was offered a two-year contract containing a restrictive covenant. This covenant stated:

> "C. For a period of one (1) year after Employee shall no longer be employed by Employer, Employee shall not, directly or indirectly, whether in the capacity of owner, partner, stockholder, employee, agent, consultant or otherwise:

>> (1) Solicit, divert, or take away or attempt to solicit, divert, or take away any client or customer who has placed commercial advertising with Employer within the twelve (12) full calendar months immediately preceding Employee's termination of employment with Employer; or

>> (2) Perform any managerial, sales, marketing, programming, transmitting or broadcasting services at another broadcast station or cable programming origination facility which broadcasts or transmits to all or any part of the viewing and listening public to which Employer broadcasts if such managerial, sales, marketing, broadcasting or programming services would mean that employee would be performing services which are the same or of similar kind or are of similar or greater responsibility as those Employee performed for Employer under this Agreement. For purposes of this Agreement, the Illinois counties listed in Attachment A to this Agreement contain the viewing and listening public to which Employee broadcasts. However, Employee may accept employment from an employer whose broadcast or cable facility at which Employee would be employed is located outside a one hundred (100) mile radius from Employer's broadcast tower located in East Peoria, Illinois.

> Employee acknowledges that a breach of any of the foregoing duties would result in an irreparable injury to Employer and that Employer would have no adequate remedy at law for such breach, and therefore, Employee agrees that Employer will be entitled to enforce its rights by injunction proceedings restraining Employee from such breaches or threatened breaches without bond."

Oloffson continued to work for Midwest for approximately 10 years, and his contract was renewed several times. He tried to eliminate the restrictive covenant from the renewal agreements, but when he failed to do so, he signed new contracts containing the provision.

Later, Oloffson was assigned to host an afternoon show for Midwest's local AM station. Oloffson performed as an on-air personal-

ity, read live commercial spots ("live sells"), and appeared at promotional events for the station, but he was not a member of Midwest's sales staff.

Midwest subsequently asked Oloffson to work on the station's morning show. Oloffson then requested greater compensation because he would be working longer hours. Although his request was rejected, he remained in the job until March 1997.

Prior to the expiration of his contract on June 30, 1997, Oloffson asked to receive his new contract early because he needed the bonuses awarded for completing his prior contract and for signing a new contract. He did not receive the new contract until July 28, 1997.

During the first week of August 1997, Oloffson discussed the possibility of becoming an on-air performer at a new local radio station with its station manager. This station had a different music format from that of Midwest's local stations. Oloffson also consulted with a lawyer about the effect the restrictive covenant would have on this move and was told the provision was unenforceable. Oloffson subsequently accepted a contract with the new station, rejected the contract proffered by Midwest and gave Midwest 30 days' notice that he was leaving.

Shortly after leaving Midwest, Oloffson worked for Golf USA, where he had made promotional appearances while with Midwest. On November 2, 1997, he began working as a disk jockey at the new radio station. A few days later, Midwest filed a motion seeking a temporary restraining order, which was granted. Midwest also requested a preliminary injunction, and a hearing on its motion was held in late November.

The trial court found in favor of Midwest and entered a preliminary injunction enjoining Oloffson for one year from performing:

> "any managerial, sales, marketing, programing, transmitting or broadcasting services at any other radio station *** which broadcasts or transmits to all or any part of the viewing and listening public to which [Midwest] broadcasts if such managerial, sales, marketing, broadcasting or programing services would mean that employee would be performing services which are the same or of similar kind or are of similar or greater responsibility as those employee performed for employer under this agreement."

However, Oloffson was able to "accept employment from an employer whose broadcast or cable facility at which employee would be employed is located outside a 100 mile radius from [Midwest's] broadcast tower located in East Peoria, Illinois."

Oloffson appeals.

## DISCUSSION

### I

Oloffson attacks the restrictive covenant on three bases. He claims that the covenant is unenforceable under the "nature of the business" and "near-permanency" tests and that it is unreasonable in scope.

### A

■ First, Oloffson argues that the restrictive covenant was unenforceable under the "nature of the business" test. See *Office Mates 5, North Shore, Inc. v. Hazen*, 234 Ill. App. 3d 557, 571-72, 599 N.E.2d 1072, 1082 (1992). Under this test, courts look to the nature of the business to determine whether a near-permanent relationship exists between an employer and its customers. Such relationships are more likely to occur in the context of professional or "pseudo-professional"[1] service organizations or businesses that garner customer loyalty by offering unique products or services than in sales-oriented businesses. *Office Mates 5*, 234 Ill. App. 3d at 571-72, 599 N.E.2d at 1081-82. However, such business relationships need not be exclusive to establish near permanency. *Audio Properties, Inc. v. Kovach*, 275 Ill. App. 3d 145, 149, 655 N.E.2d 1034, 1037 (1995).

■ In this case, the evidence shows that radio broadcasting is a highly competitive business, with stations targeting "niche" segments of listeners. The trial court, quoting *Office Mates 5*, found that Oloffson was a "pseudo-professional." The court also recognized the importance of radio celebrities such as Oloffson in attracting and maintaining listeners with their unique on-air personalities and programming. See also *Cullman Broadcasting Co. v. Bosley*, 373 So. 2d 830 (Ala. 1979) (reversing the denial of an injunction because the station relied on announcers to contact its listeners, who identified the station by the announcers); *Skyland Broadcasting Corp. v. Hamby*, 2 Ohio Op. 2d 426, 428, 141 N.E.2d 783, 785 (1957) (finding that radio personalities "are of unusual value to the employer in retaining the listening audience of a station"). Midwest's on-air personnel are also critical to its ability to sell advertising time because advertisers choose stations and time slots based on the characteristics of the listening audience.

Also, Oloffson was a highly sought-after on-air personality among

---

[1]This term was used by the court in *Office Mates 5*, but we believe that the term "quasi-professional" would be more accurate. The term "pseudo-professional" implies a "false" professional and is not a proper description of Oloffson's vocation.

Midwest's advertisers. Midwest demonstrated that Oloffson offered a unique "product" to listeners and advertisers because many of them followed him when he was transferred between its AM and FM stations. Listeners can only utilize one radio station at any given time to meet their needs, and this also tends to support a finding of near permanency.

Under these circumstances, the trial court's finding that the nature of the broadcasting business is sufficiently professional to satisfy the nature of the business test is not against the manifest weight of the evidence.

## B

■ Oloffson's second argument is that the restrictive covenant fails to satisfy the two-part "near-permanency" test. The first part of this test has seven factors: (1) the number of years the employer needs to develop its clientele; (2) the money invested to develop a clientele; (3) the difficulty involved in developing the clientele; (4) the extent of personal customer contact by the employee; (5) the employer's degree of knowledge of its customers; (6) the time the customers have been associated with the employer; and (7) the continuity of relationships between the employer and its customers. *McRand, Inc. v. van Beelen*, 138 Ill. App. 3d 1045, 1051-54, 486 N.E.2d 1306, 1311-12 (1985). The second part of the test requires the court to consider whether the employee would have had contact with the customers but for his job with the employer. *McRand*, 138 Ill. App. 3d at 1053-54, 486 N.E.2d at 1312-13.

■ The first three factors concern the development of an audience and advertisers in the context of a radio station. These factors show that Midwest spent considerable time and money to develop its listening audience and advertising customers. Radio broadcasting is highly competitive and requires extensive efforts by stations seeking to acquire listeners and advertisers. Testimony indicated that it can take more than a year to develop a relationship with a new advertising customer. Midwest must customize its approach and presentation for each potential advertiser and supplements its own marketing strategies with information purchased from market research and survey services.

In addition to these expenses, Midwest spent millions of dollars on promotional activities designed to increase its listening audience while Oloffson was on the air. These activities influenced advertisers because they want to reach the largest target audiences possible with their commercial spots. Midwest's promotional efforts highlighted Oloffson more often than any of its other on-air personalities. In one instance,

Oloffson appeared in television commercials that ran during air time valued at $378,330.

The highly competitive nature of broadcasting and the expense and marketing efforts that Midwest used to acquire new listeners and advertisers indicate that the station intended to initiate a near-permanent relationship with these groups. See *McRand*, 138 Ill. App. 3d at 1051-52, 486 N.E.2d at 1311-12.

The fourth *McRand* factor examines the extent of personal contact between Oloffson and Midwest's listeners and advertisers. He had daily contact with listeners during his broadcasts and met them in person during public appearances. Oloffson participated in remote broadcasts and appeared at high-profile community events, including halftime shows at Bradley University basketball games and the station's annual Fourth of July concert. The very nature of the communication business necessitates that Oloffson maintain considerable contact with the listening public. Moreover, Oloffson had contact with Midwest's advertisers. Advertisers often asked to meet with Oloffson prior to finalizing their plans for live sells, and Oloffson attended functions at which advertisers were present. He also did remote broadcasts and live commercials on the premises of some advertisers. His contact with one of them, Golf USA, was so extensive, in fact, that he went to work for the company after leaving Midwest.

The fifth *McRand* factor pertains to the employer's familiarity with its customer base. In this case, Midwest closely studies its listening audience and potential advertising customers and compiles extensive data on them. It also relies heavily on outside sources of information, such as the Arbitron service[2] . Midwest's continuous pursuit of knowledge concerning its listeners and advertisers indicates that it intended to develop near-permanent relationships with them. See *McRand, Inc.*, 138 Ill. App. 3d at 1052, 486 N.E.2d at 1312.

The sixth and seventh factors in the near-permanency test concern the duration and continuity of the relationship between Midwest and its listeners and advertisers. Based on records obtained from Arbitron services, Midwest could calculate the number of its listeners who had consistently followed it for five years. Midwest also had an extensive list of individual listeners' names and addresses. This evidence tends to support Midwest's claim that it has developed continuing associations with a significant number of listeners.

In addition, a sales representative for Midwest testified that 60% of her advertising accounts were long-term customers, some for over

---

[2]The Arbitron company collects and analyzes data regarding radio markets and listening audiences throughout the United States.

10 years. Midwest submitted a list of nearly 140 advertisers who had been with it for at least five years.

The record indicates that even in the highly competitive field of broadcast radio, Midwest maintained long-term relationships with a significant proportion of both its listeners and advertisers. Thus, the last two factors also favor a finding of near permanency.

The second part of the *McRand* test requires us to consider whether Oloffson would have had exposure to Midwest's listeners and advertisers but for his job with the station. We conclude that he would not. No advertisers or listeners came with him to Peoria in 1987. Only through Midwest did he develop extensive contacts with both local listeners and advertisers. This factor also favors a finding of near permanency. See *Arpac Corp. v. Murray*, 226 Ill. App. 3d 65, 74, 589 N.E.2d 640, 648 (1992).

Thus, under the "near-permanency" test, Midwest has shown a protectable business interest sufficient to justify issuance of a preliminary injunction.

## C

### 1

Last, Oloffson claims that the covenant was unenforceable because its scope was unreasonable. We disagree.

■ The key to the enforceability of a restrictive covenant is the reasonableness of its terms. *A.B. Dick Co. v. American Pro-Tech*, 159 Ill. App. 3d 786, 792, 514 N.E.2d 45, 48 (1987). One of the factors that courts generally consider in making this determination is whether the restricted geographical area is coextensive with the employer's business territory. *The Instrumentalist Co. v. Band, Inc.*, 134 Ill. App. 3d 884, 895, 480 N.E.2d 1273, 1281 (1985).

■ Here, the restricted area is a 100-mile radius from Midwest's broadcast tower in East Peoria, Illinois. The evidence shows that Midwest's stations generally have a 60-mile broadcast range, with its FM station capable of reaching up to 90 miles. Midwest's station manager testified that a 100-mile geographic restriction was necessary because a station with a somewhat stronger signal located near the edge of this zone could effectively cover Midwest's broadcast territory, competing for its listeners and advertisers.

Because the evidence indicates that Oloffson is an extremely popular radio personality, Midwest's concern that its listeners and advertisers would follow him to a station within an overlapping broadcast zone is not unreasonable. In fact, Midwest's station manager testified that both listeners and advertisers followed Oloffson when he moved between its AM and FM stations.

The geographical restriction in this case is reasonably coextensive with Midwest's business territory; it is not unreasonable.

## 2

■ The noncompetition covenant was effective for 12 months after Oloffson left Midwest. Time restrictions within restrictive covenants must also be reasonable, corresponding to the time the employer needs to acquire customers. See *Lawrence & Allen v. Cambridge Human Resource Group, Inc.*, 292 Ill. App. 3d 131, 139-40, 685 N.E.2d 434, 442 (1997).

The trial testimony established that a new advertiser's business can take much longer than 12 months to develop. The station must spend substantial amounts of time and effort to attract listeners and advertisers. It also extensively promoted its on-air personalities and frequently featured Oloffson. Approval of a one-year restriction is also not without precedent. In other contexts, our courts have approved a similar time restriction. See, *e.g.*, *Sarah Bush Lincoln Health Center v. Perket*, 238 Ill. App. 3d 958, 959-60, 963, 605 N.E.2d 613, 614, 617 (1992). Indeed, our courts have often permitted restrictions of two or even three years. See *Tomei v. Tomei*, 235 Ill. App. 3d 166, 168, 172, 602 N.E.2d 23, 24, 27 (1992) (three years); *Tyler Enterprises of Elmwood, Inc. v. Shafer*, 214 Ill. App. 3d 145, 148, 151, 573 N.E.2d 863, 865, 867 (1991) (three years); *Millard Maintenance Service Co. v. Bernero*, 207 Ill. App. 3d 736, 750, 566 N.E.2d 379, 388 (1990) (two years). Under these circumstances, the 12-month time restriction in this case is reasonably related to Midwest's business development needs.

## 3

■ Oloffson also contends that the scope of the activity restriction in the covenant is unreasonable. The covenant bars Oloffson from working in broadcasting positions that require him to perform "services which are the same or of similar kind or are of similar or greater responsibility as those" he performed for Midwest. This leaves open the possibility of a wide range of positions in the broadcasting industry that are located within the restricted geographical area under this clause. We cannot say that a covenant precluding Oloffson from performing the same job functions at a competing local station for a year is inherently unreasonable or prevents him from making a living. See *The Instrumentalist Co. v. Band, Inc.*, 134 Ill. App. 3d at 895-96, 480 N.E.2d at 1281-82.

## II

### A

■ Oloffson contends that his affirmative defenses precluded the

issuance of a preliminary injunction. He first argues that Midwest breached the contract and had unclean hands because it did not timely pay his bonuses and because it moved him between job assignments.

Oloffson does not allege that Midwest failed to pay him the required bonuses, only that the payments were late. However, the contract does not specify a payment date. It simply states that payment will be on "customary payroll dates." Minor delays in such payments do not constitute substantial nonperformance and a material breach of the contract. See *Wyatt v. Dishong*, 127 Ill. App. 3d 716, 720, 469 N.E.2d 608, 611 (1984).

In addition, Oloffson was not promised a permanent work shift or station assignment. His contract permitted Midwest to shift him between assignments at either of its radio stations in the Peoria area. Midwest is not precluded from obtaining a preliminary injunction because it exercised its contractual rights.

The trial court's finding that Midwest performed its duties under the contract in good faith is not against the manifest weight of the evidence. See *Henry County Board v. Village of Orion*, 278 Ill. App. 3d 1058, 1062, 663 N.E.2d 1076, 1080 (1996).

### B

■ Oloffson next argues that the employment agreement was invalid as a contract of adhesion. In this case, Oloffson had successfully renegotiated portions of his successive contracts. He also received the benefit of guaranteed employment for the term of each contract, as well as specified pay raises. Under these circumstances, Midwest's refusal to eliminate the noncompete covenant was not unconscionable. The trial court did not err by finding that Oloffson's employment contract with Midwest was not an adhesion contract. See *Instrumentalist Co.*, 134 Ill. App. 3d at 897, 480 N.E.2d at 1282-83.

### C

■ Finally, Oloffson contends that Midwest's failure to strictly enforce the noncompete restriction against previous employees should be deemed a waiver of its rights in his contract.

"Waiver" is the voluntary relinquishment of a known right. *Williams & Montgomery, Ltd. v. Stellato*, 195 Ill. App. 3d 544, 552, 552 N.E.2d 1100, 1105 (1990). If the facts necessary to support a finding of waiver are disputed, or if reasonable minds could draw different inferences from the evidence, waiver becomes a question of fact. See *Wald v. Chicago Shippers Ass'n*, 175 Ill. App. 3d 607, 621, 529 N.E.2d 1138, 1148 (1988). We will not overturn the factual findings of a trier of fact unless they are against the manifest weight of the evidence. *Henry County Board*, 278 Ill. App. 3d at 1062, 663 N.E.2d at 1080.

Oloffson cites *Surgidev Corp. v. Eye Technology, Inc.*, 648 F. Supp. 661, 698 (D. Minn. 1986), where a federal district court found that the employer had waived its right to enforce a noncompete covenant after it had "blithely ignored" the provision with prior employees. The evidence in this case does not support a similar finding.

On the contrary, Midwest had previously required two former employees to specifically obtain releases from the covenant that were narrowly tailored to specific jobs in the restricted area. It is clear from the testimony that those instances involved unique circumstances that do not exist in Oloffson's case. Other former Midwest employees accepted different types of positions than they had held at Midwest, worked in areas on the extreme fringe of the restricted zone, or, in one case, began working only after sitting out approximately 10 months.

Furthermore, in this case Midwest repeatedly informed Oloffson that it would enforce the restrictive covenant. Oloffson's subsequent job search outside the restricted area indicates that he knew Midwest intended to enforce the provision.

Because the evidence supports more than one possible inference, it creates a question of fact regarding whether Midwest voluntarily waived its rights. See *Pantle v. Industrial Comm'n*, 61 Ill. 2d 365, 369, 335 N.E.2d 491, 494 (1975). Based on our review of the record on appeal, we cannot say that the trial court's finding that no waiver occurred is against the manifest weight of the evidence.

## CONCLUSION

A preliminary injunction is merely a provisional remedy pending a hearing on the merits of the case. *Office Mates 5, North Shore, Inc. v. Hazen*, 234 Ill. App. 3d 557, 567, 599 N.E.2d 1072, 1079 (1992). Trial courts are given broad discretion in considering motions for injunctions. *A.B. Dick Co. v. American Pro-Tech*, 159 Ill. App. 3d 786, 791, 514 N.E.2d 45, 48 (1987). Because Midwest established a *prima facie* case supporting the issuance of a preliminary injunction, the trial court did not abuse its discretion in granting it.

The judgment of the circuit court of Fulton County is affirmed.

Affirmed.

SLATER and HOLDRIDGE, JJ., concur.