952 A.2d 999

**ECOLOGY SERVICES, INC.**

v.

**CLYM ENVIRONMENTAL SERVICES, LLC.**

**No. 1287 Sept. Term, 2007.**

Court of Special Appeals of Maryland.

July 7, 2008.

**2**

Steven K. Fedder (Andrew L. Cole, Gordon S. Young, Lettess, Lettess, Friedberg, Fedder, P.C., on brief), Owings Mills, for Appellant.

Carl S. Silverman, Baltimore, for Appellee.

Panel: JAMES R. EYLER, MEREDITH and WRIGHT, JJ.

JAMES R. EYLER, Judge.

This case arises from a complaint filed by Ecology Services, Inc., appellant, in the Circuit Court for Frederick County

against Robert Volkert, Kenneth Eubanks, Jerriel Neloms, and Osborne Raymond, all former employees of appellant, and Clym Environmental Services, LLC ("Clym"), appellees. In the complaint, appellant alleged that Clym's employment of appellees Volkert, Eubanks, Neloms, and Raymond at the campus of the National Institutes of Health (NIH) in Bethesda, Maryland, violated covenants not to compete that the appellee-employees had executed during their prior employment with appellant. Based upon these covenants not to compete, appellant requested that appellees Volkert, Eubanks, Neloms, and Raymond be enjoined from working for Clym at the NIH. Appellees filed a motion for summary judgment, which the circuit court granted.

On appeal, appellant raises the following issues: (1) whether the circuit court erred by resolving factual disputes against appellant when it granted appellees' motion for summary judgment; (2) whether the circuit court erred by failing to apply principles of Maryland law regarding enforceability of covenants not to compete; and (3) whether the circuit court erred when it held appellant did not have a protectable interest in the confidentiality of trade secrets, unique skills of the appellee-employees, and personal relationships between the appellee-employees and the NIH.[1]

Finding no error below, we shall affirm.

## Factual Background

Appellant, a Maryland corporation headquartered in Columbia, Maryland, is in the business of providing waste management services related to the treatment and disposal of low-level radioactive waste and hazardous waste materials. Appellee Clym, a Maryland limited liability company based in Frederick, Maryland, is in the same business and is a competitor of appellant. Appellee Clym is owned by Charles and

---

**1.** Appellant also raised a fourth issue: "Did the [circuit court] err when it dismissed [appellant]'s claims against Clym for intentionally and tortiously interfering with [appellant]'s contracts with its employees?" Appellant did not make any argument regarding this issue in its brief, however, and the issue is not before us.

4

Finley Watts, who are brothers, both formerly employed by appellant.

This appeal revolves around two contracts that appellant previously held with the NIH. Under the first contract, appellant was in charge of managing the delivery of radioactive waste and medical pathological materials to and from research buildings located on the NIH campus in Bethesda, Maryland, and from satellite facilities in the Baltimore–Washington metropolitan area ("Package Delivery Contract"). Under the other contract, appellant managed the transportation, processing and disposal of nuclear waste from research buildings on the NIH campus ("Radioactive Waste Contract").[2]

The Package Delivery and Radioactive Waste contracts with the NIH are competitively-bid contracts. Companies submitting bids on these contracts have to submit cost proposals as well as technical proposals to the NIH describing the practices and procedures to be applied in performing the contracts. These proposals are kept confidential by the NIH.[3]

In 2004, when the term of appellant's Package Delivery Contract was about to expire, the NIH started accepting bids on the contract. The Package Delivery Contract was designated to be set aside for a small business, and due to appellant's growth, by 2004 appellant no longer qualified as a small business. Therefore, it could not bid on the Package Delivery Contract. Clym successfully bid on the Package Delivery Contract and the NIH awarded the contract to Clym. Appellant's contract term expired in December 2004, and Clym took over the contract after that date.

---

2. Appellant's Radioactive Waste Contract with the NIH was part of a larger contract with the NIH. Under that larger contract, another company, Clean Harbors, Inc., handled non-radioactive waste disposal for the NIH.

3. The other companies that compete with appellant and appellee Clym for NIH contracts include: Radiation Services Organization, Chase Environmental, Chesapeake Nuclear, Krugar Gilbert Health Physics, Environmental Services, Inc., Clean Ventures, Clean Harbors, Inc., Onyx Environmental Services, and Stericycle.

In 2005, the term of appellant's Radioactive Waste Contract was about to expire when the NIH started accepting bids on the contract. Appellant submitted a bid to renew its contract term, but appellant lost the bidding to Clym. Appellant's contract term for the Radioactive Waste Contract expired in August 2005, and Clym took over the contract.[4] Despite losing the Package Delivery and Radioactive Waste contracts, appellant still holds other contracts with the NIH.

Appellee Neloms, while employed by appellant, worked at the NIH pursuant to the Package Delivery Contract, and his job title was "Delivery Person and Radioactive Materials Technician." Mr. Neloms' employment with appellant ended in December 2004, after the Package Delivery Contract expired.[5]

Appellees Raymond, Eubanks, and Volkert were employed by appellant to work at the NIH pursuant to the Radioactive Waste Contract. Appellee Raymond's term of employment with appellant started around 1995, and he worked in the position of "Radioactive Waste Specialist" at the NIH campus.[6] Appellees Eubanks and Volkert both worked for appellant in the same position of "Radioactive Waste Technician" at the NIH campus. Before working for appellant, both Messrs. Eubanks and Volkert had originally worked at the NIH for "Radiation Services Organization" (RSO), the predecessor company to appellant on the Radioactive Waste Contract. When appellant first won the Radioactive Waste contract in 1992, Messrs. Eubanks and Volkert continued in their positions at the NIH, while employed by appellant.

---

4. Clym's Package Delivery Contract and Radioactive Waste Contract each contained a one year renewable term.

5. Appellant claims Mr. Neloms declined other job opportunities with appellant after the Package Delivery Contract expired in 2004, but there are no facts in the record to support this assertion.

6. Appellant asserts Mr. Raymond was employed by appellant at the NIH from 1992 to 2005. In his deposition testimony, however, Mr. Raymond testified he had worked at the NIH for 10 years.

**6**

Appellees Raymond, Eubanks, and Volkert stopped working for appellant in August 2005, when the Radioactive Waste Contract expired. Appellees argue Messrs. Raymond, Eubanks, and Volkert were terminated by appellant following expiration of the contract. Appellant asserts, however, that prior to expiration of the Radioactive Waste Contract, appellees Raymond, Eubanks, and Volkert were all informed of other employment opportunities with appellant.[7]

Within the terms of the Radioactive Waste Contract, the positions of "Radioactive Waste Specialist" and "Radioactive Waste Technician" are designated as "Key Personnel," and employees filling Key Personnel positions must be approved in advance by the NIH before they can be assigned to work on the contract. The two positions have specific job descriptions in the contract. Radioactive Waste Specialists are required to have

> a degree in a natural science or engineering that includes at least 30 semester hours in health physics, engineering, radiological science, chemistry, physics, biology, mathematics, and/or calculus, or a combination of education and experience, such as courses shown above plus appropriate experience or other education certification as a health physicist by the American Board of Health Physics plus appropriate experience, and other education that provides an understanding of sciences applicable to health physics and radioactive waste management. In addition, the Contractor shall provide each Specialist with specific training in packing and shipping of radioactive wastes as required by DOT and NRC regulations.

Radioactive Waste Technicians are required to have "specialized experience" related to the work of the position that has equipped the technician with "the particular knowledge,

---

7. Ms. Ruth L. Rilee, an employee of appellant, testified at deposition that a "general, open statement of [job] opportunities" with appellant was made to appellees Raymond, Eubanks, and Volkert, "many times over the course between April [2005], when [appellant] first thought [appellant] may lose the [Radioactive Waste] contract, and then again in August [2005]."

skills, and abilities to perform the duties, or one full year of college education or an internship that is directly related to the work of the position, or a combination of specialized experience and education." Additionally, the contractor must train the technicians on the packing and shipping of radioactive waste as required by federal regulations.

The job requirements of Mr. Neloms' position as "Delivery Person and Radioactive Materials Technician" for the Package Delivery Contract were that he possess a valid commercial driver's license with a hazardous materials endorsement, and completion of an on-site radiation safety training course.

The actual job duties of Mr. Raymond, as a Radioactive Waste Specialist, involves the packaging and disposal of dry waste and radioactive waste collected from research buildings on the NIH campus. Mr. Raymond is in charge of compacting the radioactive waste into containers for disposal. NIH researchers place tags on the waste stating its level of radioactivity, and the waste is compacted according to federally mandated procedures for handling radioactive waste.

Appellees Volkert and Eubanks, as Radioactive Waste Technicians, work on the disposal of radioactive waste collected from the NIH campus and satellite facilities located in Baltimore, Lanham, and Rockville, Maryland. Messrs. Volkert and Eubanks travel in teams of two to different buildings on the NIH campus and to the satellite facilities to retrieve liquid and other waste, and then return with the waste to "Building 21" on the NIH campus. Upon returning with the waste, Messrs. Volkert and Eubanks enter data about the waste into a database and ensure that the waste is eventually disposed. Appellees assert the process for collecting and disposing of nuclear waste on the NIH campus and from the satellite facilities has not changed since the late 1980s.

As a Delivery Person and Radioactive Materials Technician, Mr. Neloms delivers packages containing small amounts of radioactive materials from "Building 21" on the NIH campus to researchers on the campus that have submitted requests for the materials. Mr. Neloms transports the radioactive materi-

als around the campus in a van, and carries a "Geiger counter" during the deliveries to assess levels of radiation and contamination at different locations. Following deliveries, Mr. Neloms is responsible for entering data as to who received the materials and the timing of the delivery. Mr. Neloms then repeats this process as more packages arrive at the NIH campus.

### The Covenants Not to Compete

In 1997, as a condition of their continued employment with appellant, appellees Raymond, Eubanks, Volkert, and Neloms were required to execute covenants of "nondisclosure and noncompetition" with appellant ("non-competition covenants"). All four employees signed the covenants, and the covenants provided, in pertinent part, that the employees would neither:

(i) directly or indirectly, divulge or disclose to any person or entity any of the Proprietary and Confidential Information or any other information or knowledge respecting the business or affairs of [appellant] ... but shall hold all of the same confidential and inviolate, nor

(ii) for a period of one (1) year after the cessation of ... employment with [appellant] for any reason whatsoever and within a radius of one hundred (100) miles from [appellant]'s principal place of business ... [c]ompete with [appellant] or in any manner whatsoever engage in any business similar to that of [appellant] in any capacity, ... [s]olicit or induce any employee of [appellant] to leave the employ of [appellant], ... [s]olicit or accept employment by or be retained by any person or entity who, at any time during the Employee's employment with [appellant] was a competitor of [appellant] or was a person or entity that contracted with [appellant].

Appellee Neloms' employment with appellant ended in December 2004, when the Package Delivery Contract expired. After Mr. Neloms' employment ended with appellant, he was hired to work as a truck driver for a paper disposal company, "Shred–It." Mr. Neloms testified at deposition that the boxes he had to carry while working for Shred–It were much heavier

than the boxes he had to carry when he worked for appellant. In February 2005, Mr. Neloms was contacted by Charles Watts at Clym about working for Clym at the NIH in the same capacity that he had worked for appellant. Mr. Neloms testified Mr. Israel Putnam, who Mr. Neloms described as the "head man" in the radiation department at the NIH, had probably referred Mr. Neloms to Mr. Watts. Mr. Putnam had also written a letter of recommendation on Mr. Neloms' behalf when Mr. Neloms left the employ of appellant in 2004.

On April 26, 2005, after appellant learned Mr. Neloms had been hired to work for Clym at the NIH, appellant's counsel wrote to Mr. Neloms and Clym demanding enforcement of Mr. Neloms' non-competition covenant with appellant.

Appellees Eubanks, Volkert, and Raymond all testified at deposition that their jobs with appellant ended when appellant's Radioactive Waste Contract with the NIH expired in August 2005. Mr. Eubanks testified that appellant offered him a position at a different waste facility but the position entailed a salary cut for Mr. Eubanks in the amount of $8,000–$9,000, and he did not take the job. Mr. Eubanks was unemployed for a week until he was contacted by Clym and offered a job to continue working as a Radioactive Waste Technician at the NIH, and Mr. Eubanks accepted the job offer.

Appellee Volkert started working for Clym as a Radioactive Waste Technician at the NIH in August 2005, after his employment with appellant ended.

At deposition, appellee Raymond testified that after his job with appellant ended in August 2005, he attempted to find a job with appellant in Gaithersburg, Maryland, and he called someone about the job but "found out [he] couldn't do it." In December 2005, appellee Raymond started working for Clym as a Radioactive Waste Specialist at the NIH.

On December 6, 2005, appellant filed a verified complaint, motion for temporary restraining order, motion for preliminary injunction, and motion for permanent injunction in the circuit court against appellees alleging breach of the non-

competition covenants. On January 31, 2006, appellant filed a verified amended complaint for indemnification, temporary restraining order, and preliminary and permanent injunctive relief ("amended complaint"). In the amended complaint, appellant alleged Messrs. Raymond, Eubanks, Volkert, and Neloms were violating their respective non-competition covenants with appellant by working for Clym. Additionally, appellant alleged that during their employment with appellant, the appellee-employees "had access to trade secrets and confidential proprietary information" of appellant's, and that upon information and belief, they had disclosed this information to Clym, further breaching their respective non-competition covenants with appellant. In the two-count amended complaint, appellant requested, in count one, a temporary restraining order to enjoin appellees from further breach of the non-competition covenants, as well as preliminary and permanent injunctions against further breach of the covenants. In count two, appellant requested indemnification for all losses and expenses arising out of or in connection with the appellee-employees' breaches of the non-competition covenants.

On February 27, 2006, appellees answered appellant's amended complaint. On April 13, 2007, appellees filed motions for summary judgment on all of the claims in appellant's amended complaint. Appellant opposed appellees' motions for summary judgment.

On June 12, 2007, the circuit court held a hearing on appellees' motions for summary judgment. On July 2, 2007, the circuit court entered an opinion and order granting appellees' motions for summary judgment as to all claims in appellant's amended complaint. The court denied appellant's request for attorney's fees.

In granting the motions for summary judgment, the court noted in its opinion that it was "disputed whether [appellees Raymond, Eubanks, Volkert and Neloms] were let go by [appellant] or whether they chose to leave [appellant] voluntarily. In any event, [the appellee-employees] were subse-

quently employed by Clym and continued to work at essentially the same jobs as they had previously with [appellant]."

The court noted that (1) neither appellant nor appellees contested the reasonableness of the limits or duration of the non-competition covenants; (2) appellees Raymond, Eubanks, Volkert and Neloms were "clearly low level employees not utilizing skills against whom covenants not to compete could be enforced," and while appellant "allege[d] they possess unique skills[,] no factual basis for this allegation ha[d] been demonstrated;" (3) the activities of the appellee-employees did not involve "the solicitation of customers, private customer lists, or assigned routes which involve solicitation of customers," and no facts were presented to support appellant's allegation that appellees used trade secrets in their employment with appellant; (4) "[b]ecause of the nature of [the appellee-employees'] services," there was "no exploitation of personal contact between employee and the customer (NIH)[;]" (5) enforcement of the covenants against appellees "would constitute an undue hardship on them;" and "the public interest would not be served by the enforcement of the covenants[;]" and (6) appellant had "failed to articulate the unique nature of the services these workers perform or the trade secrets which they allegedly possess."

Appellant filed a timely notice of appeal to this Court. Additional facts will be added as necessary.

### Standard of Review

Under Maryland Rule 2–501, a motion for summary judgment "is appropriate 'on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law.'" *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 478, 914 A.2d 735 (2007) (quoting Rule 2–501(a)). When considering a trial court's grant of summary judgment, we review the record in the light most favorable to the non-moving party and construe any reasonable inferences that may be drawn from the facts against the moving party. *See Rhoads v. Sommer*, 401 Md. 131, 148, 931 A.2d 508 (2007); *see also Harford County v. Saks*

*Fifth Ave. Distrib. Co.*, 399 Md. 73, 82, 923 A.2d 1 (2007) (court resolves any disputed material facts in favor of the non-moving party); *Lovelace v. Anderson,* 366 Md. 690, 695, 785 A.2d 726 (2001). Where no material facts are in dispute, we must determine whether the trial court correctly entered summary judgment as a matter of law, applying a *de novo* standard of review. *See Saks Fifth Ave.,* 399 Md. at 82, 923 A.2d 1; *Prop. & Cas. Ins. Guar. Corp. v. Yanni,* 397 Md. 474, 480–81, 919 A.2d 1 (2007); *Standard Fire Ins. Co. v. Berrett,* 395 Md. 439, 450, 910 A.2d 1072 (2006); *Ross v. State Bd. of Elections,* 387 Md. 649, 658–59, 876 A.2d 692 (2005).

When opposing a motion for summary judgment, "general allegations which do not show the facts in detail and with precision are insufficient to prevent the entry of a summary judgment," *Shaffer v. Lohr,* 264 Md. 397, 404, 287 A.2d 42 (1972), and a non-moving party "may not rely on bare allegations or 'a mere scintilla' of evidence to defeat a motion for summary judgment." *Labor Ready, Inc. v. Abis,* 137 Md.App. 116, 125, 767 A.2d 936 (2001) (quoting *Helman v. Kim,* 130 Md.App. 181, 192, 745 A.2d 451 (2000)); *see also Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 738, 625 A.2d 1005 (1993) ("[W]hen a movant has carried its burden, the party opposing summary judgment 'must do more than simply show there is some metaphysical doubt as to the material facts.'" (citation omitted)).

## Discussion

In challenging the circuit court's grant of appellees' motions for summary judgment, appellant argues the court erred in deciding several issues of material fact in favor of appellees. First, appellant argues there was a dispute of material fact about whether personal contacts between appellees Raymond, Eubanks, Volkert, and Neloms and the NIH made the covenants necessary for the protection of appellant's business. Appellant argues the trial court erred in finding there could not have been exploitation of the personal contacts between the appellee-employees and the NIH, and appellant offers

facts that it contends show there is an issue of fact as to exploitation.

Appellees respond that based on the job duties and responsibilities of appellees Raymond, Eubanks, Volkert, and Neloms, there was no opportunity for exploitation of the personal contacts between the employees and the NIH. Appellees explain there is no evidence that personal contacts between the appellee-employees and the NIH were essential to appellant's continued well-being as a business. Appellees argue that at the time appellant lost the Package Delivery and Radioactive Waste contracts to Clym, the appellee-employees were still employed by appellant under the respective contracts, which they contend shows personal contacts between the employees and the NIH had no bearing on appellant's ability to retain the NIH as a customer.

Next, appellant argues the circuit court erred in finding there was no factual basis for appellant's allegation that appellees Raymond, Eubanks, Volkert, and Neloms possess unique or specialized skills, and appellant argues it offered evidence to raise a dispute of fact on this issue. Appellees respond that appellant has not submitted evidence to raise an issue of fact about whether appellees Raymond, Eubanks, Volkert, and Neloms possess unique or specialized skills, and they argue the appellee-employees are unskilled workers.

Appellant next argues the court erred in finding that enforcement of the non-competition covenants would impose undue hardship on appellees Raymond, Eubanks, Volkert, and Neloms, and that the finding is inconsistent with the facts. Appellant explains that appellees Volkert, Eubanks, and Raymond were each informed about other job opportunities with appellant following expiration of the Radioactive Waste Contract, and that any dispute of fact on this issue should have been resolved in appellant's favor. As to Mr. Neloms, appellant argues any job dissatisfaction Mr. Neloms experienced while working for Shred–It, compared to working at the NIH, does not constitute undue hardship.

Appellees respond that enforcement of the covenants would impose undue hardship based on the number of years that appellees Volkert and Eubanks had worked at the NIH as Radioactive Waste Technicians; the salary cut Mr. Eubanks would have endured had he taken the other job appellant was offering when the Radioactive Waste Contract expired; the fact Mr. Neloms had to carry heavier boxes working for "Shred–It," compared to the boxes he had to carry working at the NIH; and that Mr. Raymond had been unemployed for several months prior to being hired by Clym in December 2005.

Finally, appellant argues there was nothing in the record to support the court's finding that the public interest would be best served by invalidating the non-competition covenants. Appellees respond enforcement of the covenants does not support the public interest, and that the court took proper judicial notice of the public policy against government contractors restricting the federal government's access to trained, experienced personnel.

## I. Maryland Law on Covenants Not To Compete

In Maryland, covenants not to compete may be applied and enforced generally "only against those employees who provide unique services, or to prevent the future misuse of trade secrets, routes or lists of clients, or solicitation of customers." *Becker v. Bailey*, 268 Md. 93, 97, 299 A.2d 835 (1973). The Court of Appeals in *Becker* defined the standard for determining the enforceability of covenants not to compete:

> The general rule in Maryland is that if a restrictive covenant in an employment contract is supported by adequate consideration and is ancillary to the employment contract, an employee's agreement not to compete with his employer upon leaving the employment will be upheld 'if the restraint is confined within limits which are no wider as to area and duration than are reasonably necessary for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the

public.' While such restrictions may be enforced under some circumstances, there is no sure measuring device designed to calculate when they are. Rather, a determination must be made based on the scope of each particular covenant itself; and, if that is not too broad on its face, the facts and circumstances of each case must be examined.
268 Md. at 96–97, 299 A.2d 835 (citations omitted).

██ When a covenant not to compete is reasonable on its face as to both time and space, the factors for determining the enforceability of the covenant based upon the facts and circumstances of the case are:

> whether the person sought to be enjoined is an unskilled worker whose services are not unique; whether the covenant is necessary to prevent the solicitation of customers or the use of trade secrets, assigned routes, or private customer lists; whether there is any exploitation of personal contacts between the employee and customer; and, whether enforcement of the clause would impose an undue hardship on the employee or disregard the interests of the public.

*Budget Rent A Car of Wash., Inc. v. Raab*, 268 Md. 478, 482, 302 A.2d 11 (1973).

In this case, there is no dispute about whether the non-competition covenants were reasonable on their face as to time or place. Instead, the parties dispute the enforceability of the covenants based upon the factors defined in *Budget Rent A Car*.

In reviewing whether the circuit court was legally correct in granting summary judgment against appellant and holding that the non-competition covenants are unenforceable, we must consider the following: first, whether the covenants were necessary to protect appellant's business interests; second, whether appellees Raymond, Eubanks, Volkert, and Neloms possessed unique or specialized skills; and finally, whether enforcement of the covenants would impose undue hardship on appellees Raymond, Eubanks, Volkert, and Neloms.

The material underlying facts are generally not in dispute. The facts are in dispute with respect to the question of

hardship, and thus, we resolve the dispute in favor of appellant. On those facts, the question of enforceability is one of law, and we conclude that the covenants are unenforceable.

### A.  Necessity of Non–Competition

*Covenants to Protect Appellant's Business Interests*

Upon review of the record, there are no facts showing that the personal contacts between appellees Raymond, Eubanks, Volkert, or Neloms and the NIH during the course of appellees' employment with appellant were considered by the NIH when awarding either the Package Delivery Contract or Radioactive Waste Contract, or that appellant's business benefited from such personal contacts. Instead, the facts are to the contrary—the four employees were each employed by appellant under the respective contracts when the NIH awarded the contracts to Clym. The only reasonable inference to be drawn from the facts is that job descriptions or qualifications were part of the bidding process on the Package Delivery and Radioactive Waste contracts and the successful bidder had to supply employees meeting certain requirements for those contracts, not that specific employees were part of the bidding process.

Maryland courts have recognized that covenants not to compete are not justified "if the harm caused by service to another consists merely in the fact that the former employee becomes a more efficient competitor just as the former employer did through having a competent and efficient employee." *Holloway v. Faw, Casson & Co.,* 319 Md. 324, 335, 572 A.2d 510 (1990) (quoting *Silver v. Goldberger,* 231 Md. 1, 7, 188 A.2d 155 (1963)). In contrast, covenants not to compete are justified "if a part of the compensated services of the former employee consisted in the creation of the good will of customers and clients which is likely to follow the person of the former employee." *Id.* (citation omitted).

In this case, the skills and experience that appellees Raymond, Eubanks, Volkert, and Neloms obtained during their employment with appellant made them more efficient competi-

tors of appellant when they went to work for Clym. There are no facts showing their services for appellant were related to creating the good will of the NIH.

Maryland courts have also noted a distinction

'between the cases where business success is attributable to the quality of the product being sold, and those where the personal contact of the employee with the customer is an important factor. In the latter case, the employer has a stronger need for protection against diversion of his business to the former employee who has had personal contacts with customers which the employer lacks.'

*Millward v. Gerstung Int'l Sport Educ., Inc.,* 268 Md. 483, 488–89, 302 A.2d 14 (1973) (citations omitted). *See also Becker,* 268 Md. at 96, 299 A.2d 835; *Tuttle v. Riggs–Warfield–Roloson, Inc.,* 251 Md. 45, 49–50, 246 A.2d 588 (1968). Without any evidence that appellant benefited from the personal contacts between the appellee-employees and the NIH regarding the Package Delivery or Radioactive Waste contracts, we conclude appellant's business success on those contracts was attributable to the quality of its "product."

The fact the Package Delivery and Radioactive Waste contracts were awarded through a competitive bidding process reinforces this conclusion. There are no reported cases in Maryland discussing covenants not to compete in the context of competitively-bid contracts, but courts in other jurisdictions have held that personal relationships between employee and customer generally are not relevant when contracts are competitively-bid. *See Whitmyer Bros., Inc. v. Doyle,* 58 N.J. 25, 38, 274 A.2d 577 (1971) (reversing preliminary injunction trial court imposed against defendant-employee based upon covenant not to compete with plaintiff-company, explaining most of company's work involved public bidding and that "when public work is available ... the determining factor is generally price rather than personal consideration," and there was little likelihood employee would be in a position to harm company's relationships with governmental entities); *Charles P. Young Co. v. Leuser,* 137 Ill.App.3d 1044, 1049, 92 Ill.Dec. 730, 485

N.E.2d 541 (1985) (affirming denial of preliminary injunction involving enforcement of non-competition agreement against defendant-employees and holding plaintiff-company did not show irreparable harm, one reason being that contracts in company's business were competitively-bid and most extended over a number years so that "factors such as price and dependability of service [were] more significant in making sales than the efforts of any group of salespersons"); *see also Laidlaw, Inc. v. Student Transp. of America, Inc.,* 20 F.Supp.2d 727, 755 (D.N.J.1998) (noting "goodwill is not relevant in a system that is purely the direct submission of public bids, where the only question is which applicant is the lowest responsible bidder.").

We hold that appellant failed to establish an issue of fact regarding appellees' exploitation of personal contacts with the NIH. Based on the facts in the record, appellant's success on the Package Delivery and Radioactive Waste contracts was attributable to price and the quality of its performance, not the personal contacts between the appellee-employees and the NIH, and therefore, there was no opportunity for exploitation of such contacts.

Additionally, we hold there is no evidence showing appellees Raymond, Eubanks, Volkert, and Neloms had access to trade secrets during their employment with appellant.[8]

## B. Skill–Sets of the Appellee–Employees

Despite evidence regarding the specific job requirements for the positions held by appellees Raymond, Eubanks, Volkert, and Neloms under the Package Delivery and Radioactive Waste contracts, including the education and training required for the positions held by appellees Raymond, Eubanks, and Volkert, in addition to appellant's other evidence, we find appellant failed to establish an issue of fact as to whether the

8. Appellant alleged in its amended complaint that appellees Raymond, Eubanks, Volkert, and Neloms had access to appellant's trade secrets, but appellant has not discussed this issue on appeal.

employees possess unique or specialized skills. We shall explain.

A unique or specialized skill held by an employee, by virtue of knowledge, ability, or reputation, is one that would make it difficult to find a substitute employee. *Rosenstein v. Zentz*, 118 Md. 564, 570–71, 85 A. 675 (1912).

In *Millward*, the Court of Appeals held a non-competition covenant was enforceable based, in part, on the unique reputation and qualifications of the employee. *See* 268 Md. at 489, 302 A.2d 14. The non-competition covenant at issue in *Millward* was between Gerstung International Sport Education, Inc. ("Gerstung"), which operated a physical education camp for elementary school children, and Horace D. Millward, an employee of Gerstung who worked as a teacher, camp counselor and director of the camp. Under the covenant, Millward agreed that for a period of two years following termination of his employment with Gerstung, he would not engage in the business of "physical education or sport instructions of any kind in the City of Baltimore or the surrounding counties." *Id.* at 484, 302 A.2d 14.

Prior to working for Gerstung, Millward had been the coach of a professional soccer team, the "Baltimore Bays." Gerstung believed Millward's past experiences and their publicity value made him uniquely qualified for the position, and the company issued numerous promotional and press releases advertising his association with the company. *Id.* at 485, 302 A.2d 14. After working for Gerstung for several years, Millward resigned his position and started working for a competitor of Gerstung, Sports Camp, Inc., which planned to open a summer camp in Baltimore County. Gerstung filed suit to enjoin Millward from working for Sports Camp, Inc., and the trial court granted the injunction. *Id.* at 487, 302 A.2d 14.

In affirming the injunction, the Court of Appeals emphasized the unique qualifications of Millward:

An important factor here which dictates our decision is the uniqueness of Millward's reputation and qualifications which had a direct bearing on the services he rendered for [Gerstung]. It was because of this uniqueness he was first hired

and his attributes and accomplishments were widely publicized and emphasized by Gerstung, Inc. The importance of Millward's unique qualifications and publicity value are demonstrated by the emphasis Sports Camps, Inc. placed on them in its brochure.

*Id.* at 489, 302 A.2d 14.[9]

The employee's unique job qualifications in *Millward* are distinguishable from the job qualifications of the positions at issue in this case. While the positions of appellees Raymond, Eubanks, and Volkert required education and training, these job qualifications, in of themselves, are insufficient to create an issue of fact that the skills of the employees are unique and specialized to the extent that it would be difficult for appellant to find replacements for each employee. *See Rosenstein,* 118 Md. at 570–71, 85 A. 675.

As additional evidence, appellant cites the deposition testimony of Mr. Charles Watts, who testified that upon reviewing Mr. Neloms' job application, he found Mr. Neloms had unique experience and skills based upon his experience in handling radioactive materials, and his understanding of the NIH campus and the satellite facilities. This evidence is unpersuasive, however, because "skills acquired by an employee during his or her employment do not warrant enforcement of a covenant not to compete." *Labor Ready, Inc. v. Abis,* 137 Md.App. 116, 136, 767 A.2d 936 (2001) (citations omitted); *see also* 17A C.J.S. *Contracts* § 258 (2008) ("The mere fact that an employee has acquired skill and efficiency or training in the performance of the work as a result of his or her employment does not suffice to warrant the enforcement of a covenant on his or her part not to compete." (footnotes omitted)).[10]

---

9. Other factors the Court considered in affirming the injunction were the personal contacts Millward established with potential campers through his position at Gerstung, and the effect Millward's leaving Gerstung would have on past students and campers whom Millward had worked with at the camp. *See Millward,* 268 Md. at 489, 302 A.2d 14.

10. In *Labor Ready,* this Court applied the laws of the state of Washington to interpret the enforceability of a covenant not to compete in an

Based on the actual job duties of Mr. Neloms in his position as Delivery Person and Radioactive Materials Technician, his work at the NIH is analogous to that of a courier. In *Becker*, the Court of Appeals considered the enforceability of a non-competition covenant between an automobile tag and title service company and one of its employees, Bailey, who worked as a "tag and title courier." 268 Md. at 95, 299 A.2d 835. Mr. Bailey's job responsibilities were to pick up customers' applications for tags and title, take the papers to the Department of Motor Vehicles for processing, and then deliver the tags and title to the car dealers who would forward them to their customers. *Id.* The Court of Appeals held Mr. Bailey was an unskilled worker whose services were not unique, *see id.* at 99, 299 A.2d 835 (citing *Rosenstein*, 118 Md. 564, 85 A. 675), and that the covenant not to compete was unenforceable. *See id.* at 102, 299 A.2d 835; *see also Budget Rent A Car*, 268 Md. at 482–83, 302 A.2d 11 (holding gas station proprietor was unskilled worker whose services were not unique and covenant not to compete between proprietor and car rental company, under which proprietor promised not to compete with car rental company in operating car rental business, was unenforceable).

Based on these cases, and their definition of what constitutes unique or specialized skills in the context of covenants not to compete, we conclude appellant has not established an issue of fact as to whether appellees Raymond, Eubanks, Volkert, and Neloms possess unique or specialized skills, within the context of non-competition covenants.

C. Hardship Imposed on the Appellee–Employees by Non–Competition Covenants

There is a factual dispute about whether appellees Raymond, Eubanks, Volkert, and Neloms could have remained employed by appellant, as appellant contends, or whether

---

employment contract, *see Labor Ready,* 137 Md.App. at 127, 767 A.2d 936; but we noted Maryland law and Washington law were "not substantively at variance." *Id.*

appellant terminated their employment, as appellees contend. We must resolve this factual dispute in appellant's favor, but only as to appellees Raymond, Eubanks, and Volkert, and not Mr. Neloms. Appellant presented evidence below that appellees Raymond, Eubanks, and Volkert were informed of other job opportunities with appellant involving different contracts at various times between April and August 2005, prior to the expiration of the Radioactive Waste Contract. There is no evidence that Mr. Neloms had other job opportunities with appellant following the expiration of the Package Delivery Contract in December 2004.

Ms. Ruth Rilee testified at deposition that Mr. Volkert was informed about a job opportunity on a contract involving solid and medical waste removal and recycling on the NIH campus, as well as an opportunity at appellant's Gaithersburg office involving "trash hauling services" and "residential hauling services." Ms. Rilee testified the compensation at the Gaithersburg office was comparable to what Mr. Volkert had been making on the Radioactive Waste Contract. Mr. Raymond was informed of the job opportunity at the Gaithersburg office as well. Ms. Rilee testified Mr. Eubanks was also informed about a job opportunity on the solid and medical waste removal and recycling contract at the NIH campus.

Appellant argues any finding of undue hardship is inconsistent with the fact that appellees Raymond, Eubanks, and Volkert were offered employment opportunities with appellant on other contracts. We disagree. Additional undisputed facts reveal enforcement of the covenants would impose undue hardship.

Mr. Volkert had worked at the NIH campus for appellant, performing the same job function since 1992, and had worked for appellant's predecessor company on the Radioactive Waste Contract, RSO, for one year before that. As to Mr. Volkert's job opportunity with appellant on the other NIH contract, Ms. Rilee testified Mr. Volkert did not have a specific job offer, but an "opportunity." Instead of pursuing that job opportuni-

ty, Mr. Volkert started working for Clym at the NIH shortly after appellant's contract expired in August 2005.

Mr. Raymond, who had worked for appellant at the NIH campus since around 1995, pursued the job opportunity at appellant's Gaithersburg office but learned he could not do the job. Mr. Raymond was unemployed from the time he stopped working for appellant in August 2005, until he started working for Clym in December 2005.

Mr. Eubanks had worked for appellant at the NIH campus, performing the same job function since 1992, and had worked for RSO for several years before appellant won the Radioactive Waste Contract. The other job opportunity Mr. Eubanks had with appellant's solid and medical waste removal and recycling contract at the NIH campus entailed a $8,000–$9,000 pay cut, and he did not pursue that opportunity. Mr. Eubanks was unemployed for one week until he was contacted by Clym about returning to work at the NIH.

Mr. Neloms' employment with appellant ended when the Package Delivery Contract expired. Mr. Neloms went to work for "Shred–It," where he was employed as a truck driver. Mr. Neloms testified the truck that he worked on for Shred–It did not contain a mechanical lift, that he made 20 to 30 stops a day lifting heavy bags of paper, with some bags weighing 200 lbs. For Clym, Mr. Neloms carries a bag that weighs 60 lbs.

The circumstances of the appellee employees are distinguishable from the facts of *Ruhl v. F.A. Bartlett Tree Expert, Co.*, 245 Md. 118, 225 A.2d 288 (1967). In *Ruhl*, the Court of Appeals held the provisions of a covenant between a tree service company, F.A. Bartlett Tree Expert Co. ("F.A. Bartlett"), and one its employees, Ruhl, that restricted Mr. Ruhl from competing with F.A. Bartlett for two years following termination of his employment with the company, and within a six-county area, were not unreasonable and that the covenant was enforceable. *Id.* at 126–29, 225 A.2d 288. Ruhl was the area manager for F.A. Bartlett, and his personal contacts with customers were essential to the continued well being of F.A.

Bartlett. *Id.* at 122, 225 A.2d 288. Ruhl resigned and started his own tree service company. Ruhl solicited former F.A. Bartlett customers, and the bulk of his work was derived from former F.A. Bartlett customers. *Id.* at 123, 225 A.2d 288. In holding the covenant was enforceable, the Court recognized that Ruhl would experience some hardship from enforcement of the covenant because Ruhl knew only the tree service business but the Court explained that any hardship was outweighed by F.A. Bartlett's need to protect its customer base for the two year period. *Id.*

As to appellees Volkert, Raymond, and Eubanks, we conclude that enforcement of the non-competition covenants would impose undue hardship based on the following facts: that each had been employed in their positions at the NIH for long periods of time, which in the case of Messrs. Volkert and Eubanks, dated back to the early nineties; that the opportunity at appellant's Gaithersburg office involved a different job function, i.e. trash removal instead of radioactive waste removal; that Mr. Raymond pursued the opportunity at the Gaithersburg office but learned he could not do the job and was subsequently unemployed for several months before he was hired by Clym; and that Mr. Eubanks' opportunity entailed a $8,000–$9,000 pay cut. We also conclude, based on the lack of any job opportunities for Mr. Neloms following expiration of the Package Delivery Contract, and his subsequent employment with a different company that involved heavy-lifting, that enforcement of the non-competition covenant against Mr. Neloms would impose undue hardship. Unlike in *Ruhl,* there are no substantial countervailing considerations.

We emphasize that the above factors which we have considered are just that—factors—that go into the process of determining whether the non-competition covenants are unenforceable as a matter of law. The importance of a given factor will vary, depending on the facts of each case. In the case before us, the three factors considered all weigh heavily in favor of appellees.

Based upon our conclusions above, in addition to considerations of market competition, i.e. that enforcement of the non-competition covenants would reduce the number of eligible candidates for employment positions within a federal government contract, we conclude invalidating the covenants will also serve the public interest.

In conclusion, based on the lack of evidence showing exploitation of personal contacts between the appellee-employees and the NIH, or that the appellee-employees possess unique or specialized skills; and based on the evidence of undue hardship, we hold the non-competition covenants are unreasonable and, therefore, unenforceable. The circuit court's grant of summary judgment as to all the claims in appellant's amended complaint was proper.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**